## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES RYAN (4014 W. Christy Drive, Phoenix AZ 85029), DAVID ALLEN (460 Lester Fordham Road, Statesboro, GA 30458-0155) and RONALD SHERMAN (10433 E. East Drive, Sun Lakes, AZ 85248), on Behalf of Themselves and All Others Similarly Situated, | : : : : : | No: |
| Plaintiffs, | : | **CLASS ACTION COMPLAINT** |
| v. | : | **JURY TRIAL REQUESTED** |
| WILLIAM WALTON (1919 Pennsylvania Ave., N.W., Washington, DC 20006), JOHN FIRESTONE(1919 Pennsylvania Ave., N.W., Washington, DC 20006), ANTHONY GARCIA (1919 Pennsylvania Ave., N.W., Washington, DC 20006), LAWRENCE HEBERT (1919 Pennsylvania Ave., N.W., Washington, DC 20006), LAURA VAN ROIJEN (1919 Pennsylvania Ave., N.W., Washington, DC 20006), BROOKS BROWNE (1919 Pennsylvania Ave., N.W., Washington, DC 20006), ALEX POLLOCK (1919 Pennsylvania Ave., N.W., Washington, DC 20006), MARC RACICOT (1919 Pennsylvania Ave., N.W., Washington, DC 20006), ANN BATES (1919 Pennsylvania Ave., N.W., Washington, DC 20006), EDWARD MATHIAS(1919 Pennsylvania Ave., N.W., Washington, DC 20006), ROBERT LONG(1919 Pennsylvania Ave., N.W., Washington, DC 20006), JOAN SWEENEY (1919 Pennsylvania Ave., N.W., Washington, DC 20006), ALLIED CAPITAL CORPORATION (1919 Pennsylvania Ave., N.W., Washington, DC 20006), ARES CAPITAL CORPORATION (280 Park Avenue, 22nd Floor, Building East, New York, NY 10017) and ARCC ODYSSEY CORP. (280 Park Avenue, 22nd Floor, Building East, New York, NY 10017) | : : : : : : : : : : : : : : : |  |
| Defendants. | | |

Plaintiffs, by their attorneys, allege upon information and belief, except for their own acts, which are alleged on knowledge, as follows:

1.     Plaintiffs bring this action against Defendant Allied Capital Corporation ("Allied") and against its board of directors (the "Board") seeking equitable relief for their violations of  Rule 14a-9(a) promulgated under the Securities Exchange Act of 1934 ("Rule 14a-9"), breaches of fiduciary duty and other violations of state law arising out of their attempt to sell the Company to Defendants Ares Capital Corporation and ARCC Odyssey Corp. (collectively "Ares") by means of an unfair process and for an unfair price of 0.325 Ares shares for every Allied share (the "Proposed Transaction").

## PARTIES

2.     Plaintiffs are, and have been at all relevant times, the owners of at least 34,000 shares of common stock of Allied.

3.     Allied is a corporation organized and existing under the laws of the State of Maryland.  It maintains its principal corporate offices at 1919 Pennsylvania Avenue, N.W., Washington, District of Columbia, and is a private equity firm specializing in investments in small and middle market companies.  The Company generally invests in buyouts, acquisitions, recapitalizations, note purchases, mezzanine, growth capital, middle market equity, and debt investments. It provides debt financing in the form of first lien senior loans; junior debt including second lien loans, subordinated debt, and mezzanine debt; and unitranche loans. The Company prefers to invest in business services, financial services, consumer products, healthcare services, energy services, industrial products, retail, and consumer services sectors. It seeks to invest in private companies based in the United States. The Company seeks to invest between $10 million and $150 million in debt transactions. It provides equity capital, typically in conjunction with a

debt investment for management buyouts of companies with enterprise value between $50 million and $500 million. The Company seeks control and non-control equity stakes in the portfolio companies.

4.     Defendant William Walton ("Walton") has been the Chairman of the Board of the Company since 2009.

5.     Defendant John Firestone ("Firestone") has been a director of the Company since 1993.

6.     Defendant Anthony Garcia ("Garcia") has been a director of the Company since 1991.

7.     Defendant Lawrence Hebert ("Hebert") has been a director of the Company since 1989.

8.     Defendant Laura Van Roijen ("Roijen") has been a director of the Company since 1992.

9.     Defendant Brooks Browne ("Browne") has been a director of the Company since 1990.

10.    Defendant Alex Pollock ("Pollock") has been a director of the Company since 2003.

11.    Defendant Marc Racicot ("Racicot") has been a director of the Company since 2005.

12.    Defendant Ann Bates ("Bates") has been a director of the Company since 2003.

13.    Defendant Edward Mathias ("Mathias") has been a director of the Company since 2008.

14.    Defendant Robert Long ("Long") has been a director of the Company since 1972.

15.     Defendant Joan Sweeney ("Sweeney") has been Chief Operating Officer and a director of the Company since 2004.

16.     Defendants referenced in ¶¶ 4 – 15 are collectively referred to as Individual Defendants and/or the Allied Board. The Individual Defendants as officers and/or directors of Allied, have a fiduciary relationship with Plaintiffs and other public shareholders of Allied and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

17.     Defendant Ares Capital Corporation is a Maryland corporation with its headquarters located at 280 Park Avenue, 22nd Floor, Building East, New York, NY that is a business development company. The firm specializes in acquisition, recapitalization, and leveraged buyout transactions of middle market companies.

18.     Defendant ARCC Odyssey Corp. is a Maryland corporation wholly owned by Ares Capital Corporation and created for the purposes of effectuating the Proposed Transaction.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14a-9.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (2) because complete diversity exists between Plaintiff and each Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     Venue is proper because Defendants reside, are found, have agents, and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

22.     This Court has personal jurisdiction over the Defendants because they are located in, transacted business in, or had substantial contacts with this District.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiffs, the Company, and the public shareholders of Allied and owe them the duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure.

24.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as Directors and/or officers of Allied, are obligated to refrain from:

        (a)     participating in any transaction where the directors or officers' loyalties are divided;

        (b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

        (c)     unjustly enriching themselves at the expense or to the detriment of the Company and its public shareholders.

25.     Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed Plaintiffs and other public shareholders of Allied, or are aiding and abetting others in violating those duties.

26.     Defendants also owe the Company's shareholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest.  Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all

material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

27.     In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

28.     During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Ares to attempt to eliminate the public shareholders' equity interest in Allied pursuant to a defective sales process and materially deficient disclosures, and (ii) permit Ares to buy the Company for an unfair price.  In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

29.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

30.    Plaintiffs bring this action on their own behalf and as a class action on behalf of all owners of Allied common stock and their successors in interest, except Defendants and their affiliates (the "Class").

31.    This action is properly maintainable as a class action for the following reasons:

(a)    the Class is so numerous that joinder of all members is impracticable.  As of October 27, 2009, Allied has approximately 179.10 million shares outstanding.

(b)    questions of law and fact are common to the Class, including, inter alia, the following:

(i)    Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiffs and the others members of the Class;

(ii)    Are the Individual Defendants, in connection with the Proposed Transaction of Allied by Ares, pursuing a course of conduct that is in violation of their fiduciary duties;

(iii)    Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

(iv)    Have Allied and Ares aided and abetted the Individual Defendants' breaches of fiduciary duty;

(v)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct; and

(vi)    Have Defendants misrepresented or omitted material facts in the joint preliminary proxy filed as part of Defendant Ares' registration statement on SEC Form N-14 on December 16, 2009.

(c)    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(d)    Plaintiffs' claims are typical of those of the other members of the Class.

(e)    Plaintiffs have no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

32.    In a press release dated October 26, 2009, the Company announced that it had entered into a merger agreement with Ares, stating:

> New York, NY—October 26, 2009—Ares Capital Corporation (NASDAQ: ARCC) and Allied Capital Corporation (NYSE: ALD) announced today that they have entered into a definitive agreement under which Ares Capital will acquire Allied Capital in an all stock transaction currently valued at $648 million, or approximately $3.47 per Allied Capital share.  This represents a 27.3% premium to Allied Capital's closing stock price on Friday, October 23, 2009. The Boards of Directors of both companies have each unanimously approved the transaction.
>
> Under the terms of the transaction, Allied Capital stockholders will receive 0.325 Ares Capital shares for each Allied Capital share, resulting in approximately 58.3 million Ares Capital shares being issued in exchange for the approximately 179.4 million

outstanding Allied Capital shares.  Following the transaction, Ares Capital stockholders will own approximately 65% of the combined company and Allied Capital stockholders will own approximately 35%.  The combined company will remain externally managed by Ares Capital Management LLC, an affiliate of Ares Management LLC and will remain headquartered in New York.  Bennett Rosenthal, Michael Arougheti and Richard Davis will remain in their current roles as Ares Capital's Chairman, President and Chief Financial Officer, respectively.  It is expected that one member of Allied Capital's Board will be nominated to serve on Ares Capital's Board.

Consummation of the acquisition is subject to Allied Capital stockholder approval, Ares Capital stockholder approval, customary regulatory approvals, certain Ares Capital and Allied Capital lender consents and other closing conditions.  The transaction is expected to close by the end of the first quarter of 2010.

33.    On October 30, 2009 the Company filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger Agreement").  The announcement and filings reveal that the Proposed Transaction is the product of a flawed sales process and is being consummated at an unfair price.

34.    Based on the $10.69 per share closing price of Ares stock on October 23, 2009, the last trading day prior to the announcement, the Proposed Transaction valued Allied at approximately $3.47 per share for a total transaction value of approximately $648 million.  In the few months prior to the Proposed Transaction, Allied stock had been trading well in excess of this $3.47 value.  In fact, as recently as August 3, 2009, Allied's stock traded at $4.10 per share, and it traded as high as $7.87 in November 2008.  Moreover the Company has a book value of approximately $6.70 per share. In addition, Wall Street analysts have set a mean price target for Allied Capital stock at $3.75 per share with at least one analyst setting a $4.50 price target.

35.     In addition, the average price of Ares stock for the six-month period prior to the announcement is approximately $8.77 which would imply a share value for Allied of only $2.85 per share.

36.     Thus, the consideration Allied shareholders are to receive is inadequate.

37.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait d'accompli*.

38.     First, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Allied Board from soliciting proposals relating to alternative tender offers or business combinations which may increase shareholder value.  The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to alternative business combinations.  In addition to the "no shop" and "standstill" provisions, the Merger Agreement includes a $30 million termination fee should the Board choose to accept a superior deal.

39.     Section 6.7(c) of the Merger Agreement severely restricts the Board's ability to enter into discussions and negotiations involving a competing unsolicited bid requiring the Board to (i) determine after consulting with the Company's outside legal counsel and financial advisors that the competing bid would reasonably be expected to result in a superior proposal; (ii) determine that the failure to take such action would violate its fiduciary duties; (iii) give Ares notice to the effect that the Company entering into discussions or negotiations with another bidder; (iv) receives from the bidder an executed confidentiality agreement; and (v) provide to Ares copies of any information provided to the other party that Ares does not already have.

40.     Further, Section 6.7(d) provides a very limited exception under which the Board may recommend an alternative acquisition proposal, requiring the Board to (i) provide Ares with written notice that the Company has received a superior proposal, specifying the material terms and conditions of the superior proposal and the identify the bidder making such a superior proposal, (ii) provide Ares with a five (5) calendar day period during which the Ares may propose a modification to the Merger Agreement for the purpose of causing the alternative acquisition proposal to no longer be a superior proposal.

41.     Thus, even if the Allied Board receives an intervening bid that appeared to be superior to Ares's offer, it is precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is "superior." Consequently, this provision prevents the Allied Board from exercising their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the Allied Board first determines that the proposal is superior.

42.     Despite these onerous provisions, the Allied Board did, in fact, receive a competing and far superior offer – an offer which it rejected.

### THE COMPETING OFFER

43.     On January 19, 2010, Allied filed an 8-K with the SEC attaching a press release it had issued that same day.  That press release noted the Board of Directors of Allied had "unanimously rejected an unsolicited non-binding offer from Prospect Capital Corporation ["Prospect"] to acquire all of the issued and outstanding shares of [Allied] in a stock-for-stock merger." ("Prospect Offer").

44.     An Associated Press article discussing the Prospect Offer noted it was "valued at about $900 million," while the Proposed Transaction was "valued at $648 million."

11

45.     However, Allied rejected the Prospect Offer.  Its January 19, 2010 press release asserted the terms of the Prospect Offer "would imply a small premium to the value of the exchange ratio provided for in the merger with Ares Capital" and that the reasons for its rejection of the Prospect Offer stemmed from "significant risks relating to, among other things, the ability for the combined company to maintain dividend payments post-closing and to access the capital markets on favorable terms to provide for further growth of the business and certainty of closing."

46.     The next day, Allied filed another 8-K disclosing a letter its Board of Directors had received from the CEO of Prospect criticizing "the cavalier manner in which you dealt with our *bona fide* offer is a continuation of your stonewalling over the last nine months in the face of our numerous expressions of serious interest in acquiring Allied."  The letter went on to assert that the previous day's 8-K "misleadingly fails to disclose several material facts—made clear in our offer—that directly refute your stated reasons for rejecting our offer out of hand."  The letter articulated these misrepresentations as follows:

- **Superior Current Value.** Contrary to your assertion that we are offering only a "small premium" to the Ares merger, our offer provides significantly superior current value for Allied shareholders. More specifically, based on an after-market trading price of $12.93 per share of Prospect common stock on January 19, 2010, Prospect's offer represents a value of $4.98 per share of Allied common stock, which is an approximately 10% premium to the $4.53 value per Allied share implied by an exchange ratio of 0.325 of a share of Ares common stock in the Ares merger (based on a $13.94 after-market trading price of Ares common stock price on January 19, 2010).

- **Superior Dividend Payments.** You have asserted without any support that Prospect's offer presents "significant risks" relating to the combined company's ability to maintain dividend payments. In fact, Ares cut its dividend in 2009 by 17% while Prospect has increased its dividend in each of the 21 quarters since its 2004 initial public offering. Prospect pays a $0.40875 per share dividend, compared to $0.35 per share for Ares. Based on our proposed exchange ratio of 0.385 of a share of Prospect

common stock for each share of Allied common stock, our offer would provide Allied shareholders with a dividend of $0.157 per share of Allied common stock as compared with a dividend of $0.114 per share of Allied common stock under the Ares merger.

- **Superior Access to Additional Debt and Equity Capital**. Contrary to your professed concern that Prospect's offer poses "significant risks" concerning future access to the capital markets, we believe that based on Prospect's track record, a Prospect/Allied combination would provide Allied shareholders with superior access to debt and equity capital markets. Prospect has successfully completed 13 equity offerings since 2004, including ten offerings aggregating more than $350 million since the inception of the credit dislocation in mid-2007 and six equity offerings aggregating more than $200 million during 2009. Unlike Ares, Prospect increased both its credit facility size and its number of lenders over the last year.

- **Superior Leverage Profile.** In addition, your Form 8-K fails to acknowledge the point made in our offer that Prospect currently has a debt/equity ratio of less than 0.1x, which, pro forma for the proposed Prospect/Allied combination, would provide significant de-leveraging for Allied shareholders. Ares, by comparison, has a debt/equity ratio of approximately 0.7x, which Prospect believes makes an Ares/Allied combination riskier for Allied's shareholders. Further, Prospect enjoys investment grade ratings with Standard and Poor's and Moody's for Prospect's corporate rating and credit facility rating, respectively, which we believe Allied's lenders and shareholders would view positively.

47.     The letter also noted that Prospect had "relied solely on Allied's public documents in making the offer" and went on to note that "[t]o the extent that you can provide us, which your agreement with Ares allows you to do, with information that demonstrates that a higher valuation of Allied is justified, we would be prepared to discuss an increase in the consideration to be paid in our offer."

48.     By summarily rejecting the Prospect Offer despite the manifestly superior consideration being offered, and by falsely describing is as not being superior to the Proposed Transaction without the benefit of any genuine due diligence, the Allied Board has acted utterly

unreasonably and has breached its fiduciary duties of care and loyalty, and have pursued the Board members' own interests in the Ares transaction to the detriment of Allied shareholders.

49.     Similarly, by failing to use the Prospect Offer as leverage to garner a higher price for the Proposed Transaction, the Allied Board breached its fiduciary duties of care and loyalty, and pursued the Board members' own interests in the Ares transaction to the detriment of Allied shareholders.

## THE MATERIALLY MISLEADING AND/OR INCOMPLETE REGISTRATION AND JOINT PROXY STATEMENT

50.     On December 16, 2009, Ares filed a Form N-14 Registration Statement with the SEC in connection with the Proposed Transaction, which specifically notes it also "constitutes a joint proxy statement under Section 14(a) of the Securities Exchange Act of 1934." This document is referred to herein as the "Registration and Joint Proxy Statement."

51.     The Registration and Joint Proxy Statement contains an opinion from Bank of America/Merrill Lynch Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") purportedly containing BofA Merrill Lynch's "opinion as to the fairness, from a financial point of view, to the holders of Allied Common Stock of the Exchange Ratio provided for in the Transaction." It also contains an opinion from Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), which purportedly provides Sandler O'Neill's "opinion as to the fairness, from a financial point of view, of the Exchange Ratio to the holders of Allied Common Stock."

52.     The Registration and Joint Proxy Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

53.     For example, the Registration and Joint Proxy Statement fails to disclose the information disclosed in Prospect's January 20th letter: that is, that Prospect had made "numerous expressions of serious interest in acquiring Allied" over the previous nine months, while discussions concerning the Proposed Transaction were ongoing.

54.     Similarly, the Registration and Joint Proxy Statement failed to disclose Allied's discussions with Prospect created the possibility of significantly greater consideration for Allied shareholders than those shareholders would receive from the Proposed Transaction.  Indeed, the Company does not appear to have disclosed that a competing offer with the prospect of a greater premium had been made until that offer had been summarily rejected.

55.     Even now, Allied's disclosures of the Prospect Offer have been (at best) minimal; Allied has still failed to disclose significant details related to the Prospect Offer, including the history, details, and potential effects of the Prospect Offer on the Proposed Transaction.

56.     Moreover, the Registration and Joint Proxy Statement fails to disclose management's projection of future income and cash flow (under both the "stand-alone" and refinancing transaction scenario) ("Company Projections"), which serve as the foundation of the conclusions of both BofA Merrill Lynch and of Sandler O'Neill.

57.     Indeed, both BofA Merrill Lynch and Sandler O'Neill concede that they took on face value, without further investigation, the projections management prepared for their use. Even more surprisingly, BofA Merrill Lynch states in the N-14 that "[t]he EPS estimates used by BofA Merrill Lynch to calculate the indicative share values set forth above under the columns entitled '2009 EPS (MGMT)' and '2010E EPS (Mgmt)' were prepared by Allied Capital's management solely for purposes of BofA Merrill Lynch's analysis and do not purport to

represent the opinion of Allied Capital's management as to Allied Capital's EPS for 2009 and 2010."

58.     It is impossible for a reasonably informed person to adequately evaluate the correctness of BofA Merrill Lynch and Sandler O'Neill's valuations of Allied without knowledge of the Company Projections.    Indeed, without the Company Projections, the many questions critical to evaluating the Proposed Merger (e.g. the value of synergies, the effect of the imposition of large management and incentive fees by Ares Capital Management following the merger, etc.) are largely unanswerable.

59.     This is particularly true in light of the background of the Proposed Transaction. In August 2009, Allied restructured its then-significant debt load (at a higher cost of capital) with the knowledge that its debt would need to be greatly reduced in the near future.  To that end, on October 30, 2009, Allied sold its interest in Senior Secured Loan Fund LLC (the "SL Fund," formerly known as the Unitranche Fund) to Ares for $165 million in cash.  Evaluating the effects of these economic times, of fair market accounting of Allied's assets, and of Allied's debt restructuring would be a formidable task, and the interplay of these forces on the future of Allied would, in large part, be embodied in the Company Projections.

60.     Thus, the Registration and Joint Proxy Statement should disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by BofA Merrill Lynch so that shareholders can properly assess the credibility of the various analyses performed by BofA Merrill Lynch and relied upon by the Board in recommending the Proposed Transaction.

61.     In particular, the Registration and Joint Proxy Statement is deficient and should provide, *inter alia*, the following:

(i)      The Company Projections,

(ii)     The financial projections and forecasts of Ares relied upon by BofA Merrill Lynch in rendering its fairness opinion.

(iii)    The financial metrics used by BofA Merrill Lynch in its *Relative Contribution Analysis*, including the net income, net investment income, and dividends forecasts for both Allied and Ares for years 2010, 2011, and 2012 used in the analysis, and the total assets and net asset value forecasts of Allied and Ares as of December 31, 2009 used in the analysis.

(iv)     The criteria utilized by BofA Merrill Lynch to select the companies used in its *Selected Publicly Traded Companies Analysis of Allied.*

(v)      The multiples observed for each company (or at least the high/median/mean/low range) in the *Selected Publicly Traded Companies Analysis of Allied* and the criteria used by BofA Merrill Lynch to select the reference ranges (0.4 to 0.6 NAV; 6.0x to 9.0x 2009 EPS; and 5.0x to 8.0x 2010 EPS) applied to Allied's corresponding financial data for each multiple.

(vi)     The 2009 EPS and 2010E EPS estimates of Allied selected by BofA Merrill Lynch to use in its *Selected Publicly Traded Companies Analysis of Allied* and the criteria used to select such numbers out of the several estimates provided to them by Allied management.

(vii)    The reasons BofA Merrill Lynch used only one transaction in the *Selected Precedent Transaction Analysis of Allied* and the criteria used to select that transaction.

(viii)   Allied's NAV per share and 2009E EPS used by BofA Merrill Lynch in its *Selected Precedent Transaction Analysis of Allied,* and the criteria used by BofA Merrill Lynch select the 2009E EPS out of the several estimates provided to them by Allied management, as well as the source of those estimates (i.e. which sets of forecasts these estimates came from).

(ix)     The key inputs used in the *Discounted Cash Flow Analysis of Allied*, including:

(a)      The timing and amount of dividends projected to be paid by Allied in the status quo and 2010 refinancing scenarios.

(b)     The timing and amounts of payments projected to be made in the liquidation scenario.

(c)     The timing and amounts of dividends projected to be paid by Ares in the merger scenario.

(d)     The criteria used by BofA Merrill Lynch to select the discount rates used in the analysis, i.e. the specific information that BofA Merrill Lynch "deemed relevant" when selecting these discount rates.

(e)     The data set (of the trading history of Allied and Ares common stock) used by BofA Merrill Lynch to select the dividend yield range of 9% to 11%.

(x)     The criteria utilized by BofA Merrill Lynch to select the companies used in its *Selected Publicly Traded Companies Analysis of Ares.*

(xi)    The multiples observed for each company (or at least the high/median/mean/low range) in the *Selected Publicly Traded Companies Analysis of Ares* and the criteria used by BofA Merrill Lynch to select the reference ranges (0.9 to 1.1 NAV; 7.0x to 9.0x 2009 EPS; and 6.0x to 8.0x 2010 EPS) applied to Ares' corresponding financial data for each multiple.

(xii)   The 2010E EPS estimates of Ares selected by BofA Merrill Lynch to use in its *Selected Publicly Traded Companies Analysis of Ares* and the criteria used to select such number out of the several estimates provided to them by Ares management, as well as the source of those estimates (i.e. which sets of forecasts these estimates came from).

(xiii)  The key inputs used in the *Discounted Cash Flow Analysis of Ares*, including:

(a)     The timing and amount of dividends projected to be paid by Ares.

(b)     The criteria used by BofA Merrill Lynch to select the discount rates of 11% to 13% used in the analysis, i.e. the specific information that BofA Merrill Lynch "deemed relevant" when selecting these discount rates.

(c)     The data set (of the trading history of Ares common stock) used by BofA Merrill Lynch to select the dividend yield range of 11% to 13%.

62.     In addition, the Registration and Joint Proxy Statement should disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by Sandler O'Neill, so that shareholders can properly assess the credibility of the various analyses performed by Sandler O'Neill and relied upon by the Board in recommending the Proposed Transaction.  In particular, the Registration and Joint Proxy Statement is deficient and should provide, *inter alia*, the following:

(i)     The Company Projections and the financial projections and forecasts Ares relied upon by Sandler O'Neill in rendering its fairness opinion.

(ii)    The criteria utilized by Sandler O'Neill to select the companies used in its *Comparable Company Analysis.*

(iii)   The multiples observed for each company (or at least the high/mean/low range) in the *Comparable Company Analysis*.

(iv)    The conclusions drawn and/or the implied per share equity range calculated by Sandler O'Neill from the *Comparable Company Analysis*.

(v)     The reasons Sandler O'Neill used only one transaction in the *Analysis of Selected Merger Transactions,* the criteria used to select that transaction, and more detail as to the "trends" discussed, as well as the conclusions reached from this analysis.

(vi)    The key inputs used in the *Discounted Dividend Stream and Terminal Value Analysis*, including:

(a)     The criteria used by Sandler O'Neill to select price to net asset value multiples of 0.90x to 1.30x.

(b)     The criteria used to select dividend yields ranging from 10.0% to 14.0%.

> (c)     The criteria used to select discount rates ranging from 18.0% to 22.0% in its analysis of Allied.
>
> (d)     The criteria used to select discount rates ranging from 12.0% to 16.0% in its analysis of Ares.

> (vii)   The amount of the dilution and accretion for December 31, 2009, 2010, 2011, and 2012 observed by Sandler O'Neill for Allied in the *Pro Forma Merger Analysis*.

63.     Moreover, the Registration and Joint Proxy statement has attached a fairness opinion from J.P. Morgan Securities, Inc. ("J.P. Morgan"), purportedly providing J.P.Morgan's "opinion as to the fairness, from a financial point of view, [of the Proposed Transaction] to Ares Capital Corporation."  However, the Registration and Joint Proxy Statement completely fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by J.P. Morgan so that shareholders can properly assess the credibility of the various analyses performed by J.P. Morgan.  In particular, the Registration and Joint Proxy Statement is deficient and should provide, *inter alia*, the following:

> (i)     The Company Projections and the financial projections and forecasts of Ares relied upon by J.P. Morgan in rendering its fairness opinion.

> (ii)    The estimated amount and timing of cost savings and related expenses and synergies expected to result from the merger reviewed by J.P. Morgan when rendering its fairness opinion.

> (iii)   The criteria used by J.P. Morgan to discount Allied's NAV by $344 million in the *Net Asset Value per Share Analysis of Allied.*

> (iv)    The criteria utilized by J.P. Morgan to determine which companies were analogous to Allied that were used in its *Public Trading Multiples Analysis of Allied.*

> (v)     The multiples observed for each company in *Public Trading Multiples Analysis of Allied*, which twelve-month period was used for each company and the criteria used to select such twelve-month period, and the criteria used to select the 0.28x – 0.80x P/NAV reference range applied to Allied's NAV per share.

(vi)     The reasons J.P. Morgan used only one transaction in the *Selected Transaction Analysis of Allied* and the criteria used to select that transaction.

(vii)    The criteria used to select P/NAV ratios between 0.60x and 0.90x and discount rates ranging from 17% to 21% used in the *Dividend Discount Analysis of Allied*.

(viii)   The criteria utilized by J.P. Morgan to determine which companies were analogous to Ares that were used in its *Public Trading Multiples Analysis of Ares*.

(ix)     The multiples observed for each company in *Public Trading Multiples Analysis of Ares* and the criteria used to select the reference ranges (0.92x – 1.10x P/NAV and 9% - 15% Dividend Yield) applied to Ares' corresponding financial data for each multiple.

(x)      The criteria used to select P/NAV ratios between 0.90x and 1.30x and discount rates ranging from 11% to 15% used in the *Dividend Discount Analysis of Ares*.

(xi)     The reasons J.P. Morgan did not add a control premium in the *Relative Valuation Analysis*.

64.     The Registration and Joint Proxy Statement also fails to describe material information concerning the sales process conducted by the Company, if any.  As stated above, it fails to disclose the repeated expression of interest and attempts to enter into merger negotiations that had been made over the course of the prior eight months by Prospect, nor does it disclose that the Board had repeatedly rejected such overtures without permitting Prospect to enter into an arrangement with Allied to conduct due diligence.  Moreover, the Registration and Joint Proxy Statement states that the Company explored "entering into a business combination with a financial services firm," but it fails to disclose the steps undertaken to pursue such alternative, including, for example, how many parties were contacted, the criteria used to select such parties, the discussions and negotiations held with each party, and whether any indications of interest

were submitted. It is absolutely necessary for shareholders to receive a Registration and Joint Proxy Statement that provides all material disclosures related to the sales process in order for shareholders to be able to cast a fully informed decision regarding the Proposed Transaction.

65.     Further, the Registration and Joint Proxy Statement omits material information regarding the conflicts of interest BofA Merrill Lynch has in the Proposed Transaction.  In particular, certain affiliates of BofA Merrill Lynch serve as a lender to Allied. On page 146 of the Registration and Joint Proxy Statement, it states that BofA Merrill Lynch and Allied restructured certain of Allied's debt obligations to BofA Merrill Lynch, and that "pursuant to the terms of the Allied Capital credit facilities, the entire outstanding indebtedness thereunder would be required to be repaid upon consummation of the merger," but it fails to disclose the amount of this indebtedness that is being repaid. In addition, the Registration and Joint Proxy Statement that "BofA Merrill Lynch and its affiliates in the past have provided, currently are providing and in the future may provide investment banking, commercial banking and other financial services to Allied Capital and have received or in the future may receive compensation for the rendering of these services," but it fails to disclose the amount of compensation received and the amount that may be received for such services.  Lastly, the Registration and Joint Proxy Statement also states that:

> certain of BofA Merrill Lynch's affiliates are limited partners in certain private investment funds affiliated with Ares Capital. It is currently anticipated that Ares Capital's Credit Facility, under which an affiliate of BofA Merrill Lynch is an agent bank and a lender, will be amended (including, among other things, to increase its size), ***for which such affiliate would receive compensation***. It is also possible that BofA Merrill Lynch and its affiliates might be involved in refinancings of Allied Capital and Ares Capital's other outstanding credit facilities and notes ***for which they would receive compensation.***

However, the Registration and Joint Proxy Statement fails to disclose the amount of compensation that affiliates of BofA Merrill Lynch would receive from the anticipated amendments to Ares' credit facilities.

66.     The Registration and Joint Proxy Statement also fails to describe material information concerning discussions and negotiations with Ares.  For example, the Registration and Joint Proxy Statement:

> (i)     States that in early 2009, Allied and Ares discussed a "variety of potential transactions," but it fails to disclose what other transactions were discussed other than a business combination.

> (ii)    Fails to disclose the terms (i.e. exchange ratio/price per share) discussed and negotiated between Allied and Ares from Ares' initial inquiry in early 2009 through August 7, 2009 when the companies determined not to proceed with a transaction.

> (iii)   States numerous times throughout the Registration and Joint Proxy Statement that "representatives of Allied Capital's management some of whom are also members of its board of directors" attended various meetings with Ares (e.g. April 13, July 1, August 5, August 6, August 7, October 24, and October 25, 2009), but it fails to disclose which members attended such meetings.

> (iv)    Fails to disclose the reasons Allied determined to enter into an exclusivity period with Ares on July 27, 2009 thus precluding Allied from negotiating a business combination with other potential parties.

> (v)     Fails to disclose what was discussed between Ares and Allied representatives at the August 6 and August 7, 2009 meetings.

> (vi)    Fails to disclose a) which Allied board member attended the August 11, 2009 meeting with Ares and with advisors of Allied Capital's private noteholders, b) what was discussed at this meeting, and c) the reasons Ares and Allied determined not to recommence negotiations after this meeting.

> (vii)   Fails to disclose the implied per share price of Ares' October 1, 2009 offer to purchase the Company for 0.30 shares of Ares common stock for each share of Allied.

67.     The Registration and Joint Proxy Statement further omits material information necessary to allow shareholders to evaluate the pros and cons associated with the other strategic alternatives, other than the sale of the Company to Ares, discussed by the Board -- information which is vital to shareholders in deciding how to vote regarding the Proposed Transaction.  In particular, the Registration and Joint Proxy Statement:

(i)     Fails to disclose what "structural and financing issues" caused the Board to determine not to pursue any strategic alternatives in the summer of 2008.

(ii)    Fails to disclose the terms/price of a potential business combination discussed with Company X in October and November 2008, and the reasons Allied and Company X determined not to proceed with a transaction on November 8, 2008.

(iii)   States, that among the strategic alternatives discussed by the Company in 2009, the Company considered "agreeing to a large investment by a strategic investor" or "converting to an operating company," but it fails to disclose the efforts undertaken to pursue each alternative reasons and the outcome of those efforts.

(iv)    States that on July 24, 2009, BofA Merrill Lynch made a presentation to Allied regarding "an analysis of the strategic alternatives available" to Allied, and that at the same meeting the Board authorized management to "continue to explore other strategic alternatives discussed," but it fails to disclose what those strategic alternatives were.

(v)     States that in August 2009, the Board determined to "request bids for its asset management platform" and that it "requested bids from a variety of market participants" but it fails to disclose how many participants were bids requested from, the criteria used to select such participants, how many parties submitted bids other than Ares, and the reasons the Board determined to sell the SL Fund, the Senior Debt Fund, the Knightsbridge Funds and Emporia Funds to Ares.

68.     Finally, the Registration and Joint Proxy Statement also fails to disclose:

(i)     The members of the Allied Capital Investment Bank Committee selected by the Board to engage financial advisors and negotiate their fees, and the criteria used to select such members; and

(ii)    Which financial advisor Allied retained in early 2009 in connection with the restructuring of Allied's debt.

69.     By virtue of these material omissions of fact relating to the Proposed Transaction and the Prospect Offer, the Registration Statement and Joint Proxy Statement is materially misleading, and is likely to cause Allied's shareholders to vote their shares in a different manner than they would if they were in possession of the material facts.

## ADDITIONAL NONDISCLOSURES

70.     On January 20, 2010, an affiliate of The Blackstone Group, GSO Capital Partners, entered into an agreement to purchase the Collateral Management Agreements of nine collateralized debt obligation (CDOs) and collateralized loan obligation (CLO) funds ("Callidus Funds") from managed by Callidus Capital Management (a portfolio company of Allied) for an undisclosed amount ("Callidus Sale")

71.     The total assets of the Callidus Funds are reportedly $3.2 billion.

72.     This sale may greatly affect future income and change the dynamic of the pricing for the Proposed Transaction.   Absent the disclosure of the financial details of the Callidus Sale and its impact on Allied's financial projections, a shareholder cannot evaluate whether the value received in the Proposed Transaction is reasonable compared to the value of their interest in Allied on a standalone basis.

73.     Allied's failure to disclose the details of the Callidus Sale is likely to cause Allied's shareholders to vote their shares in a different manner than they would if they were in possession of the material facts.

**SELF-DEALING**

74.     By reason of their positions with Allied, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Allied, and especially the true value and expected increased future value of Allied and its assets, which they have not disclosed to Allied's public shareholders.   Moreover, despite their duty to maximize shareholder value, the Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Allied's public shareholders.

75.     For example, as stated on page 165 of the Registration and Joint Proxy Statement, Allied Capital's directors have received stock options from the company, some of which are unvested. Once the Proposed Transaction is consummated, all these unvested stock option will vest and be exercisable and the directors will thus be entitled to receive Ares common stock for these previously unvested options. The Registration and Joint Proxy Statement should disclose here how many vested and unvested options are owned by each Board member and the weighted average exercise price of such options.

76.      In addition, Defendant Sweeney entered into a retention agreement with Allied, pursuant to which, upon consummation of the Proposed Transaction, if Defendant Sweeney is terminated by Allied without cause or if Sweeney terminated her employment for good reason, she will be entitled to receive payments of up to $2 million.

77.     In addition, Defendant Walton entered into a retention agreement with Allied, pursuant to which, upon consummation of the Proposed Transaction, if Defendant Walton is terminated by Allied without cause or if Walton terminated his employment for good reason, he will be "entitled to severance pay equal to (1) three times (one times in the event of death or disability) the average of base and bonus compensation for the preceding three fiscal years, plus

(2) a lump-sum severance amount, plus (3) a cash payment to assist in paying for certain post-termination health and welfare benefits." The Registration and Joint Proxy Statement should disclose here the dollar amount of severance payments Walton may receive here as a result of such agreement.

78.    Also, upon completion of the Proposed Transaction, one member of Allied's Board will join the Ares board of directors.

79.    Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to Allied's public shareholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members. The Proposed Transaction is an attempt to deny Plaintiffs and the other members of the Class their rights while usurping the same for the benefit of defendants on unfair terms.

80.    Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

<u>**CLAIM FOR RELIEF**</u>

**COUNT I**
**(Breach of Fiduciary Duty Against Individual Defendants)**

81.    Plaintiffs repeat all previous allegations as if set forth in fill herein.

82.    As Directors of Allied, the Individual Defendants stand in a fiduciary relationship to Plaintiffs and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.

83.    As discussed herein, the Individual Defendants have breached their fiduciary duties to Allied stockholders by failing to engage in an honest and fair sale process.

84.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Allied's assets.

85.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

86.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty -- Disclosure
### (Against Individual Defendants)

87.     Plaintiff repeats all previous allegations as if set forth in full herein.

88.     The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiffs and the Class all information material to the decisions confronting Allied's shareholders.

89.     As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

90.     As a result, Plaintiffs and the Class members are being harmed irreparably.

91.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT III
## Aiding and Abetting
### (Against Ares)

92.     Plaintiffs repeat all previous allegations as if set forth in full herein.

93.     As alleged in more detail above, Ares is well aware that the Individual Defendants have breached their fiduciary duties.   Defendants Ares aided and abetted the Individual Defendants' breaches of fiduciary duties.

94.     As a result, Allied, Plaintiffs and the Class are being harmed.

95.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT IV
### Violations of Rule 14a-9(a) promulgated under the Securities Exchange Act of 1934
### (Against All Defendants)

96.     Plaintiffs repeat all previous allegations as if set forth in full herein.

97.     During the Relevant Period, defendants disseminated the false and misleading Registration and Joint Proxy Statement specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material face necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 14a-9.

99.     The Proxy Statements violates § 14(a) and Rule 14a-9 because it omits material facts necessary to make the statements made not misleading, as set forth in ¶¶ 50 – 69, *supra*.  If Plaintiffs and the other members of the Class were in possession of the facts that have been concealed and omitted by Defendants, Plaintiffs and other members of the Class would be materially less likely to vote their shares in favor of the Proposed Transaction.

100.     In the exercise of reasonable care, defendants knew or should have known that the Proxy Statement was materially false and misleading and would be relied upon by Allied shareholders in determining how to vote their shares in the upcoming vote on the Proposed Transaction.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

(B)     temporarily restraining and/or enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiffs and the Class rescissory damages, which Plaintiffs believe may amount to as much as approximately $252 million;

(D)     directing that Defendants account to Plaintiffs and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

January 25, 2010

FINKELSTEIN THOMPSON LLP

Donald J. Enright, Esq. (MD013551)
Michael G. McLellan, Esq. (489217)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Tel:  (202) 337-8000
Fax:  (202) 337-8090

**OF COUNSEL**
LEVI & KORSINSKY, LLP
Eduard Korsinsky, Esq.
Juan E. Monteverde, Esq.
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171