## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES RYAN, DAVID ALLEN and RONALD SHERMAN, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM WALTON, JOHN FIRESTONE, ANTHONY GARCIA, LAWRENCE HEBERT, LAURA VAN ROIJEN, BROOKS BROWNE, ALEX POLLOCK, MARC RACICOT, ANN BATES, EDWARD MATHIAS, ROBERT LONG, JOAN SWEENEY, ALLIED CAPITAL CORPORATION, ARES CAPITAL CORPORATION and ARCC ODYSSEY CORP. <br><br> Defendants. | : : : : : : : : : : : : | No: 1:10-CV-00145-RMC <br><br> **MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |

Plaintiffs hereby move this for (1) expedited discovery and (2) for a preliminary injunction. Because Plaintiffs challenge a corporate transaction scheduled to close on March 26, 2010, Plaintiffs request the following schedule: (1) a production of documents by Defendants no later that 7 days from the date this Court rules on the request for expedited discovery, (2) completion of depositions no later that 14 days from the date this Court rules on Plaintiffs' request for expedited discovery and (3) a hearing on Plaintiffs' Motion for a Preliminary Injunction 21 days after this Court rules on Plaintiffs' request for expedited discovery, or as soon thereafter as convenient for the Court.  Plaintiffs further request that both Motions be subject to the same briefing schedule: Defendants' opposition should be due 7 days after this Motion is filed, and Plaintiffs' Reply should be due 7 days thereafter.

The reasons for this Motion are set forth in the Memorandum submitted herewith, as well as such other papers and argument as may be presented to the Court.

Dated: January 26, 2009

FINKELSTEIN THOMPSON LLP

/s Donald J. Enright
Donald J. Enright, Esq. (MD013551)
Michael G. McLellan, Esq. (489217)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Tel:  (202) 337-8000
Fax:  (202) 337-8090

**OF COUNSEL**
LEVI & KORSINSKY, LLP
Eduard Korsinsky, Esq.
Juan E. Monteverde, Esq.
Ian T. Matyjewicz
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES RYAN, DAVID ALLEN and RONALD SHERMAN, on Behalf of Themselves and All Others Similarly Situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>WILLIAM WALTON, JOHN FIRESTONE, ANTHONY GARCIA, LAWRENCE HEBERT, LAURA VAN ROIJEN, BROOKS BROWNE, ALEX POLLOCK, MARC RACICOT, ANN BATES, EDWARD MATHIAS, ROBERT LONG, JOAN SWEENEY, ALLIED CAPITAL CORPORATION, ARES CAPITAL CORPORATION and ARCC ODYSSEY CORP.<br>　　　　　　Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No:  1:10-CV-00145-RMC<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 2

FACTS ............................................................................................................................... 6

A.      Superior Offer .................................................................................................... 6

B.      Self Dealing ....................................................................................................... 9

C.      Preclusive Deal Protection ............................................................................... 10

D.      Misleading Proxy ............................................................................................. 12

        1.      Disclosures on advice from Financial Advisors ................................... 12

        2.      Disclosures on Sales Process ............................................................... 14

        3.      Conflicts of Interest:  Merrill Lynch .................................................... 14

ARGUMENT .................................................................................................................... 16

I.      APPLICABLE STANDARD ............................................................................. 16

II.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS ............................. 17

        A.      The Board Has a Duty to Maximize Shareholder Value and to Disclose
                Material Information ............................................................................. 17

                1.      Defendants breached their duty to maximize shareholder value ..............13

                2.      Defendants breached their duty to disclose material information.............14

        B.      Preclusive Deal Protections ................................................................. 21

III.    THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF A  PRELIMINARY
        INJUNCTION IS NOT ENTERED ................................................................... 22

IV.     A PRELIMINARY INJUNCTION WOULD NOT SUBSTANTIALLY    INJURE
        OTHER INTERESTED PARTIES ..................................................................... 24

V.      A PRELIMINARY INJUNCTION WOULD FURTHER THE PUBLIC  INTEREST... 26

VI.      EXPEDITED DISCOVERY IS APPROPRIATE ..............................................26

# TABLE OF AUTHORITIES

## Cases

*Allen v. News Corp.*, No. 979, 2005 WL 415095 (Del. Ch. Feb. 3, 2005) ................................... 28

*Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994) ........................................ 19

*Avyash v. Bank Al-Madina,* 233 F.R.D. 325, 326 (S.D. N.Y. 2005). ......................................... 26

*Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279 (Del. 1989)......................................................... 19

*City of Harper Woods Employees' Retirement System v. Olver*, 577 F. Supp. 2d 124
   (D.D.C. 2008) ...................................................................................................................... 16

*CityFed Fin. Corp. v. Off. of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995) ................. 16

*Council on American-Islamic Relations v. Gaubatz,* 2009 WL 3600329 (D.D.C) ...................... 16

*Council on American-Islamic Relations v. Gaubatz,* No. 09-2030, 2009 WL 3600329
   (D.D.C. Nov. 3, 2009) .......................................................................................................... 16

*CSX Transp. Inc., v. Williams*, 406 F.3d 667 (D.C.C 2005)........................................................ 27

*Cuomo v. United States Regulatory Commission,* 772 F.2d, 972, 974 (D.C. Cir. 1985)............. 16

*Disability Rights Council of Greater Washington v. Washington Metropolitan Area
   Transit Authority*, 234 F.R.D. 4 (D.D.C. 2006)......................................................................... 27

*Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987) .................................. 17

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F.Supp.2d 986, 991 (S.D. Tex.
   2004) .................................................................................................................................... 27

*F. T. C. v. University Health, Inc.*, 938 F.2d 1206, 1210 (11th Cir. 1991)................................... 28

*Gimbel v. Signal Cos.*, 316 A.2d 599 (Del. Ch. 1974).................................................................. 24

*Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1555 (3d Cir. 1994) .......................... 28

*Harmony Mill Ltd. Partnership v. Magness*, No. 7463, 1984 WL 21898  (Del. Ch., Feb.
   14, 1984) .............................................................................................................................. 28

*HCA Inc.*, 2006 WL 348273, at *2 ................................................................................................ 23

*In re Anderson, Clayton Shareholders Litig.*, 519 A.2d 669 (Del. Ch. 1986)................. 24, 25, 26

*In re HCA Inc.*, No. 2307-N, 2006 WL 3480273, at *2 (Del. Ch. Nov. 20, 2006)...................... 28

*In Re Int'l Jensen S'holders Litig.*, No. 14992, 1996 WL 422345, (Del.Ch., July 13,
   1996) .................................................................................................................................... 27

*In re Netsmart Techs. S'holders Litig.,* 934 A.2d 171, 203 (Del. Ch. 2007) ............................... 20

*In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002)........................ 23

*In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421 (Del. Ch. 2002) ................................ 19

*In re Staples, Inc. S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001) ........................................ 24, 25

*In re Topp Co. S'holders Litig.,* 926 A.2d 58 (Del.Ch. 2007) ..................................... 18

*Malone v. Brincat,* 722 A.2d 5 (Del. 1998) ............................................................. 19

Michigan Citizens For An Indep. Press v. Thornburgh, C.A. No. 88-2322, 1988 WL 90388 (D.D.C. Aug. 17, 1988) ...................................................................... 22

*Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 697, 934 A.2d 450, 463 (Md. App. 2007) ............................................................................................... 17

*Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App.185, 461 A.2d 45 (Md. App. 1983) ............................................................................................... 17

*Netsmart Tech., Inc. S'holders Litig.,* 924 A.2d 171, 207 (Del. Ch. 2007) ................... 23

*ODS Technologies v. Marshall,* 832 A.2d 1254, 1262 (Del. Ch. 2003) ....................... 28

*ODS Technologies, L.P. v. Marshall,* 832 A.2d 1254, 1262 (Del. Ch. 2003) ............... 22

*ODS Technologies, L.P. v. Marshall,* 832 A2d 1254, 1262-3 (Del Ch 2004) ............... 23

*Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914, 934 (Del. 2003) .................... 21

*Paramount Commc'ns Inc. v. QVC Network, Inc.,* 637 A.2d 34, 48-49 (Del. 1994) .................. 18

*Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 74, 242 A.2d 512, 539 (1968) ............................................................................................. 19

*Quest Commc'ns Int'l Inc. v. Worldquest Networks, Inc.,* 213 F.R.D. 418, 419 (D.Colo. 2003) ................................................................................................. 26

*Revlon, Inc. v. McAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del. 1986).......... 21, 22

*Roizen v. Multivest, Inc.,* No. 6535, 1981 WL 7631 (Del. Ch. Sept. 25, 1981)............................ 16

*Ronson Corp. v. Liduifin Aktiengesellschaft,* 483 F.2d 846, 848 (3d Cir. 1973)......................... 28

*Rosenblatt v. Getty Oil Co.,* 493 A.2d 929 (Del. 1985) .................................................... 19

*Sealy Mattress Co. v. Sealy, Inc.,* 532 A.2d 1324 (Del. Ch. 1987)........................................ 16, 24

*See, e.g., Granny Goose Foods, Inc v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 94 S.Ct. 1113 (1974)..................... 16

*Semitoole Inc. v. Tokyo Electron Am.,Inc.,* 208 F.R.D. 273, 275 (N.D. Cal. 2002) .................... 27

*Shell Petroleum, Inc. v. Smith,* 606 A.2d 112 (Del. 1992)............................................................. 19

*Shenker v. Laureate Education, Inc.,* 411 Md. 317, 983 A.2d 408 (Md. 2009) ..................... 16, 18

*Stroud v. Grace,* 606 A.2d 75 (Del. 1992)................................................................................... 19

*Valin v. Locke,* 628 F.Supp. 67 (D.D.C. 2009) ........................................................................... 27

*Virginia Bankshares, Inc v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749 (1991) ......................... 20

*Wisconsin Inv. Bd. v. Bartlett,* No. 17727, 2000 WL 193115 (Del. Ch. Feb. 9, 2000) ............... 25

Plaintiffs respectfully move the Court for expedited discovery and for a preliminary injunction. Plaintiffs propose the following schedule: (1) a production of documents by Defendants no later that 7 days from the date this Court rules on the request for expedited discovery, (2) completion of depositions no later that 14 days from the date this Court rules on Plaintiffs' request for expedited discovery and (3) a hearing on Plaintiffs' Motion for a Preliminary Injunction 21 days after this Court rules on Plaintiffs' request for expedited discovery, or as soon thereafter as convenient for the Court. Plaintiffs further request that both Motions be subject to the same briefing schedule: Defendants' opposition should be due 7 days after this Motion is filed, and Plaintiffs' Reply should be due 7 days thereafter.

Plaintiffs' Motion for a Preliminary Injunction seeks to preliminarily enjoin the consummation of the acquisition of Allied by Ares Capital Corporation and ARCC Odyssey Corp. (collectively "Ares") (the "Proposed Transaction") until *all* material information is disclosed to Allied shareholders to allow them to make an informed decision on whether to vote in favor of the Proposed Transaction. Plaintiffs additionally seek to preliminarily enjoin Defendants from continuing to refuse, in breach of their fiduciary duties, to negotiate a potential transaction with Prospect Capital Corporation ("Prospect") that provides Allied shareholders substantially greater consideration for their shares of Allied stock than does the Proposed Transaction.[1]

Because the transaction is scheduled to close on March 26, 2010, Plaintiffs also request expedited discovery to present the Court with a more complete factual record upon which to consider the merits of the Plaintiffs' request for a preliminary injunction. This expedited discovery would include, but not be limited to, the reason(s) Prospect's offer was rejected, as

---

[1] On January 19, 2010, Allied's Board of Directors rejected a superior offer from Prospect valued at $900 million. Prospect increased its offer on January 26, 2010 to $903.5 million.

well as the reason(s) that Prospect's numerous expressions of serious interest in acquiring Allied over the last nine months were ignored and were not disclosed in the Company's Registration Statement and Joint Proxy filed with the United States Securities and Exchange Commission ("SEC") on January 26, 2010.

Unless this Court orders the requested relief, Allied shareholders will be immediately and irreparably harmed because they will lose substantial consideration for their shares and be forced to make a decision whether to vote in favor of the Proposed Transaction without sufficient information.

## FACTS

On October 26, 2009, the Company announced that it had entered into a merger agreement (the "Merger Agreement") with Ares, for Ares to acquire Allied in an all stock transaction valued at $648 million, or approximately $3.47 per Allied share. Allied stockholders will receive 0.325 Ares shares for each Allied share, resulting in approximately 58.3 million Ares shares being issued in exchange for the approximately 179.4 million outstanding Allied shares. Following the transaction, Ares stockholders will own approximately 65% of the combined company and Allied stockholders will own approximately 35%.[2]

### A.      Superior Offer

In January 2010, Prospect made a superior, unsolicited, non-binding offer to acquire all of the issued and outstanding shares of Allied in a stock-for-stock merger representing approximately 15% more value for Allied's shareholders than the Proposed Transaction (the "Prospect Offer"). More specifically, based on an after-market trading price of $12.93 per share of Prospect common stock on January 19, 2010, Prospect's offer represents a value of $4.98 per

---

[2] Allied's stock closed at $2.73 per share on October 23, 2009. (Matyjewicz Decl Ex 1)

share of Allied common stock, which is an approximately 15% premium to the $4.53 value per Allied share implied by an exchange ratio of 0.325 of a share of Ares common stock in the Ares merger (based on a $13.94 after-market trading price of Ares common stock price on January 19, 2010). (Matyjewicz Decl Ex. 1) As more fully discussed below, the Prospect Offer provides Allied shareholders with greater consideration for their shares, a higher dividend, more access to debt and equity capital, and less risk than the Proposed Transaction. An Associated Press article discussing the Prospect Offer noted it was "valued at about $900 million," while the Proposed Transaction was "valued at $648 million."

On January 19, 2010, Allied issued a press release stating that its Board of Directors of had "*unanimously rejected*" the Prospect Offer despite its aforementioned superiority, asserting that the Prospect Offer "would imply a small premium to the value of the exchange ratio provided for in the merger with Ares Capital" and pointing to "significant risks relating to, among other things, the ability for the combined company to maintain dividend payments post-closing and to access the capital markets on favorable terms to provide for further growth of the business and certainty of closing." (Matyjewicz Decl Ex. 3)

The next day, Allied filed another 8-K disclosing a letter its Board of Directors had received from the CEO of Prospect criticizing "the cavalier manner in which you dealt with our *bona fide* offer is a continuation of your stonewalling over the last nine months in the face of our numerous expressions of serious interest in acquiring Allied." (Matyjewicz Decl Ex 4)  The letter went on to assert that the previous day's 8-K "misleadingly fails to disclose several material facts—made clear in our offer—that directly refute your stated reasons for rejecting our offer out of hand."  The letter articulated these misrepresentations as follows:

- **Superior Current Value.** Contrary to your assertion that we are offering only a "small premium" to the Ares merger, our offer provides

significantly superior current value for Allied shareholders. More specifically, based on an after-market trading price of $12.93 per share of Prospect common stock on January 19, 2010, Prospect's offer represents a value of $4.98 per share of Allied common stock, which is an approximately 10% premium to the $4.53 value per Allied share implied by an exchange ratio of 0.325 of a share of Ares common stock in the Ares merger (based on a $13.94 after-market trading price of Ares common stock price on January 19, 2010).

- **Superior Dividend Payments.** You have asserted without any support that Prospect's offer presents "significant risks" relating to the combined company's ability to maintain dividend payments. In fact, Ares cut its dividend in 2009 by 17% while Prospect has increased its dividend in each of the 21 quarters since its 2004 initial public offering. Prospect pays a $0.40875 per share dividend, compared to $0.35 per share for Ares. Based on our proposed exchange ratio of 0.385 of a share of Prospect common stock for each share of Allied common stock, our offer would provide Allied shareholders with a dividend of $0.157 per share of Allied common stock as compared with a dividend of $0.114 per share of Allied common stock under the Ares merger.

- **Superior Access to Additional Debt and Equity Capital**. Contrary to your professed concern that Prospect's offer poses "significant risks" concerning future access to the capital markets, we believe that based on Prospect's track record, a Prospect/Allied combination would provide Allied shareholders with superior access to debt and equity capital markets. Prospect has successfully completed 13 equity offerings since 2004, including ten offerings aggregating more than $350 million since the inception of the credit dislocation in mid-2007 and six equity offerings aggregating more than $200 million during 2009. Unlike Ares, Prospect increased both its credit facility size and its number of lenders over the last year.

- **Superior Leverage Profile.** In addition, your Form 8-K fails to acknowledge the point made in our offer that Prospect currently has a debt/equity ratio of less than 0.1x, which, pro forma for the proposed Prospect/Allied combination, would provide significant de-leveraging for Allied shareholders. Ares, by comparison, has a debt/equity ratio of approximately 0.7x, which Prospect believes makes an Ares/Allied combination riskier for Allied's shareholders. Further, Prospect enjoys investment grade ratings with Standard and Poor's and Moody's for Prospect's corporate rating and credit facility rating, respectively, which we believe Allied's lenders and shareholders would view positively.

The letter also noted that Prospect had "relied solely on Allied's public documents in making the offer" and went on to note that "[t]o the extent that you can provide us, which your agreement with Ares allows you to do, with information that demonstrates that a higher valuation of Allied is justified, we would be prepared to discuss an increase in the consideration to be paid in our offer." (Matyjewicz Decl Ex 4)

By summarily rejecting the Prospect Offer despite the manifestly superior consideration being offered, and by falsely describing it as not being superior to the Proposed Transaction without the benefit of any genuine due diligence (or disclosures to shareholders), the Allied Board of Directors has acted utterly unreasonably and has breached its fiduciary duties of care and loyalty, and have pursued the Board members' own interests in the Proposed Transaction to the detriment of Allied shareholders.  These breaches were exacerbated on January 26, 2010 when Prospect increased its offer 0.4 common shares of Prospect for each share of Allied, up from 0.385 Prospect shares for each Allied share – a total value of $903.5 million, offering a 19 percent premium over Allied's Monday, January 25, 2010 closing stock price.

**B.      Self Dealing**

The Board's reasons for rejecting the Prospect Offer and nine months of Prospect's overtures are indeed suspect.  Allied's directors have received stock options from the Company, some of which are unvested.  Once the Proposed Transaction is consummated, all these unvested stock option will vest and be exercisable, and the directors will thus be entitled to receive Ares common stock for these previously unvested options.

In addition, Defendant Sweeney entered into a retention agreement with Allied, pursuant to which, upon consummation of the Proposed Transaction, if Defendant Sweeney is terminated

by Allied without cause or if Sweeney terminated her employment for good reason, she will be entitled to receive payments of up to $2 million.

Defendant Walton also entered into a retention agreement with Allied, pursuant to which, upon consummation of the Proposed Transaction, if Defendant Walton is terminated by Allied without cause or if Walton terminated his employment for good reason, he will be "entitled to severance pay equal to (1) three times (one time in the event of death or disability) the average of base and bonus compensation for the preceding three fiscal years, plus (2) a lump-sum severance amount, plus (3) a cash payment to assist in paying for certain post-termination health and welfare benefits." Further, upon completion of the Proposed Transaction, one member of Allied's Board will join the Ares board of directors.

Based on the aforementioned, the Proposed Transaction is wrongful, unfair, and harmful to Allied's public shareholders and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Allied shareholders. The Proposed Transaction is an attempt to deny Plaintiffs and the other Allied shareholders their rights while usurping the same for the benefit of Defendants on unfair terms.

### C.    Preclusive Deal Protection

Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and to attempt to ensure that no competing offers will emerge for the Company including a termination. First, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Allied Board from soliciting proposals relating to alternative tender offers or business combinations which may increase shareholder value. The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from

even engaging in discussions or negotiations relating to alternative business combinations.  In addition to the "no shop" and "standstill" provisions, the Merger Agreement includes a $30 million termination fee should the Board choose to accept a superior deal.

Section 6.7(c) of the Merger Agreement severely restricts the Board's ability to enter into discussions and negotiations involving a competing unsolicited bid requiring the Board to (i) determine after consulting with the Company's outside legal counsel and financial advisors that the competing bid would reasonably be expected to result in a superior proposal; (ii) determine that the failure to take such action would violate its fiduciary duties; (iii) give Ares notice to the effect that the Company entering into discussions or negotiations with another bidder; (iv) receives from the bidder an executed confidentiality agreement; and (v) provide to Ares copies of any information provided to the other party that Ares does not already have.

Section 6.7(d) provides a very limited exception under which the Board may recommend an alternative acquisition proposal, requiring the Board to (i) provide Ares with written notice that the Company has received a superior proposal, specifying the material terms and conditions of the superior proposal and the identify the bidder making such a superior proposal, (ii) provide Ares with a five (5) calendar day period during which the Ares may propose a modification to the Merger Agreement for the purpose of causing the alternative acquisition proposal to no longer be a superior proposal. These provisions attempt to discourage bidders from making a competing bid for the Company.

Even if the Allied Board receives an intervening bid that appeared to be superior to Ares' offer, it is precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is "superior."  Consequently, this provision prevents the Allied Board from exercising their fiduciary duties and precludes an

investigation into competing proposals unless, as a prerequisite, the majority of the Allied Board first determines that the proposal is superior.

### D.   Misleading Proxy

On December 16, 2009, Ares filed a Form N-14 Registration Statement and Joint Proxy (the "Proxy") with the SEC in connection with the Proposed Transaction.[3]  (Matyjewicz Decl Ex 2).  The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.  On January 16, 2010, Ares filed an Amended Proxy that fails to correct these disclosure violations. (Matyjewicz Decl Ex 5).

#### 1.   Disclosures on advice from Financial Advisors

As alleged in the Complaint, the Proxy completely fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by the Bank of America/Merrill Lynch Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"), including the financial projections and forecasts of the Company relied upon by BofA in rendering its fairness opinion.   In addition, the Proxy failed to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), retained by the Company to render a fairness opinion, and J.P. Morgan Securities Inc. ("J.P. Morgan"), Ares' financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by them which were upon by the Board in recommending the Proposed Transaction.

In August 2009, Allied restructured its significant debt load, but at a higher cost of capital, with the knowledge that its debt would need to be greatly reduced in the near future.

---

[3] The Proxy is attached as Matyjewicz Decl Ex. 2.

(Affidavit of Mary O'Connor, ASA, MRICS, Partner and Director of Valuation Services of RGL

Forensics, Matyjewicz Decl Ex 1)  On October 30, 2009, Ares reached an agreement to acquire

Allied's interests in its Senior Secured Loan Fund LLC (the "SL Fund," formerly known as the

Unitranche Fund) for $165 million in cash.  The SL Fund currently holds "unitranche loans"

totaling approximately $900 million.[4] The fairness opinion issued to Allied provides a reduced

valuation for Allied due to the elimination of the SL Fund because it assumes the sale of the SL

Fund will close.

On January 20, 2010, an affiliate of the Blackstone Group, GSO Capital Partners, entered

into an agreement to purchase the Collateral Management Agreements of Callidus Capital

Management, a portfolio company of Allied for an undisclosed amount.  *Id.*  Total assets of the

Callidus funds are reported to be $3.2 billion according to Blackstone's press release. *Id.* Per Ms.

O'Connor's affidavit:

> [E]valuating the effects of extraordinary economic times, the intricacies of fair value accounting as it relates to Allied's assets, Allied's debt restructuring and of Callidus would be a daunting task for a valuation analyst. The interplay of these forces of the future of Allied would, in large part, be embodied in management's financial projections. These projections are critical for a shareholder to understand how Allied is currently positioned and what its prospects are for the future. These projections go the heart of shareholder value and without them, it is impossible to evaluate whether a reasonable value is being achieved in the Proposed [Transaction]."

*Id.* As such, absent "the disclosure of the financial details of this proposed transaction and its

impact on Allied's financial projections, a shareholder cannot evaluate whether the value

received in the Proposed Merger is reasonable compared to the value of their interest in Allied on

a standalone basis." (Matyjewicz Decl Ex 1)

---

[4] The SL Fund acquisition was expected to close by the end of October 2009 subject to completion of final documentation and satisfaction of closing conditions but no information has been disclosed indicating that the acquisition took place.

2.     Disclosures on Sales Process

The Proxy fails to describe material information concerning the sales process conducted by the Company, including the criteria used to select a potential partner, the discussions and negotiations held with such partners as well as Ares, and the other strategic alternatives, other than a sale of the Company considered by the Board.  In addition, the Proxy fails to disclose that Prospect made nine months' worth of overtures to the Company, which were ignored, or to provide any explanation as to why the Board refused to enter into negotiations with Prospect. The Proxy states that, the Company explored "entering into a business combination with a financial services firm," but it fails to disclose the steps undertaken to pursue such alternative, including, for example, how many parties were contacted, the criteria used to select such parties, the discussions and negotiations held with each party, and whether any indications of interest were submitted.  It is absolutely necessary for shareholders to receive a Proxy that provides all material disclosures related to the sales process in order for shareholders to be able to cast a fully informed decision regarding the Proposed Transaction.

3.     Conflicts of Interest:  Merrill Lynch

The Proxy omits material information regarding the conflicts of interest BofA Merrill Lynch has in the Proposed Transaction.  In particular, certain affiliates of BofA Merrill Lynch serve as a lender to Allied. BofA Merrill Lynch and Allied restructured certain of Allied's debt obligations to BofA Merrill Lynch, and that "pursuant to the terms of the Allied Capital credit facilities, the entire outstanding indebtedness thereunder would be required to be repaid upon consummation of the merger," but it fails to disclose the amount of this indebtedness that is being repaid. In addition, the Proxy states that "BofA Merrill Lynch and its affiliates in the past have provided, currently are providing and in the future may provide investment banking,

commercial banking and other financial services to Allied Capital and have received or in the future may receive compensation for the rendering of these services," but it fails to disclose the amount of compensation received and the amount that may be received for such services.

The Proxy also states that certain of BofA Merrill Lynch's affiliates are limited partners in certain private investment funds affiliated with Ares Capital.  It is currently anticipated that Ares Capital's Credit Facility, under which an affiliate of BofA Merrill Lynch is an agent bank and a lender, will be amended (including, among other things, to increase its size), for which such affiliate would receive compensation.  It is also possible that BofA Merrill Lynch and its affiliates might be involved in refinancings of Allied Capital and Ares Capital's other outstanding credit facilities and notes for which they would receive compensation.  The Proxy fails to disclose the amount of compensation that affiliates of BofA Merrill Lynch would receive from the anticipated amendments to Ares' credit facilities.

As such, a preliminary injunction is necessary to prevent the shareholders from being immediately and irreparably harmed by an unfair sales process that fails to consider a superior offer from Prospect and fails to disclose material information regarding the Proposed Transaction.  Plaintiff requests that any acquisition of Allied by Ares be preliminarily enjoined and require the Board to immediately amend the Proxy to disclose additional facts revealing the reasons, if any, that the Prospect Offer was rejected and require Allied to enter into good faith negotiations with Prospect.

## ARGUMENT

### I.    APPLICABLE STANDARD

The purpose of a preliminary injunction is to preserve the status quo. *See, e.g., Granny Goose Foods, Inc v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423 (1974). In order to obtain a preliminary injunction the moving party must show: (1) the likelihood of success on the merits; (2) that it would suffer irreparable injury if a preliminary injunction were not granted; (3) that a preliminary injunction would not substantially injure other interested parties and (4) that the public interest would be furthered. *Council on American-Islamic Relations v. Gaubatz,* No. 09-2030, 2009 WL 3600329 (D.D.C. Nov. 3, 2009). In applying the four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in area can compensate for weakness in another. *CityFed Fin. Corp. v. Off. of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Cuomo v. United States Regulatory Commission,* 772 F.2d, 972, 974 (D.C. Cir. 1985) (the test is a flexible one, for relief may be granted "with either a high probability of success and some injury, or *vice versa*").

Preliminary injunctions are often granted in lawsuits where, as here, directors have breached their fiduciary duties owed to shareholders in connection with mergers and acquisitions.[5] *See, e.g., Sealy Mattress Co. v. Sealy, Inc.*, 532 A.2d 1324, 1326, 1342 (Del. Ch. 1987) (granting minority shareholders motion to preliminarily enjoin proposed cash-out merger due to directors' breach of fiduciary duties); *Roizen v. Multivest, Inc.*, No. 6535, 1981 WL 7631, at *4 (Del. Ch. Sept. 25, 1981) (preliminary enjoining going-private merger where directors, who were also majority shareholders, failed to show that merger was fair to minority shareholders or

---

[5] The internal affairs of a corporation are governed by the state of incorporation. *See City of Harper Woods Employees' Retirement System v. Olver*, 577 F. Supp. 2d 124 (D.D.C. 2008). Allied's state of incorporation is Maryland, which looks to "Delaware's acknowledged leadership in developing a coherent body of corporate law." *Shenker v. Laureate Education, Inc.,* 411 Md. 317, 983 A.2d 408 (Md. 2009).

that the cash-out price was reasonable); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (explaining that shareholders' right to make an informed, uncoerced decision requires specific, not substitutional remedy for which damages would be neither meaningful nor adequate).

Because Defendants have breached their fiduciary duties by disseminating misleading information to shareholders, and failing have a fair sales process by refusing to negotiate in good faith with Prospect, a preliminary injunction is warranted because Allied shareholders will be immediately and irreparably harmed unless Defendants' breaches are cured.

## II.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

### A.  The Board Owe the Allied Shareholders Fiduciary Duties of Candor, Due Care, Loyalty and Fair Dealing

Under Maryland law, a director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) in good faith; (2) in a manner he reasonably believes to be in the best interest of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. *See* Corporations and Associations Article of the Annotated Code of Maryland § 2-405.1. Correspondingly, a court may intervene to prevent (or annul) conduct on part of directors that is fraudulent or represents breach of their fiduciary obligations. *Mountain Manor Realty, Inc. v. Buccheri*, 55 Md.App.185, 461 A.2d 45 (Md. App. 1983).

#### 1.      Defendants breached their duty to conduct a fair process

Directors of Maryland corporations owe a fiduciary duty to their shareholders to act in good faith and with reasonable due care. *Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 697, 934 A.2d 450, 463 (Md. App. 2007).  By failing to engage in good faith negotiations with Prospect when such negotiations hold the possibility of providing significantly superior

17

consideration for Allied's shareholders, Defendants have breached those duties. *See In re Topps Co. S'holders Litig.,* 926 A.2d 58 (Del.Ch. 2007) (explaining it was likely that dissident stockholders and competing bidder would succeed on the merits of their claim that incumbent directors violated their duty to ensure that stockholders received the highest value where competing bidder responded with a bid that was 10% higher than proposed buyer's and board did not appear to negotiate with the competing bidder in good faith).

Additionally, in the context of a sale of the corporation, directors of Maryland corporations owe fiduciary duties of candor and maximization of shareholder value to their shareholders beyond those enumerated in § 2-405.1 regarding the directors' management of the business affairs of a corporation. *Shenker v. Laureate Education, Inc.,* 411 Md. 317, 983 A.2d 408 (Md. 2009). Once a decision is made to sell the corporation, the directors have a fiduciary duty to the shareholders to maximize shareholder value and make full disclosure of all material facts concerning the merger to the shareholders. *Id.* at 338, 420 (*citing Paramount Commc'ns Inc. v. QVC Network, Inc.,* 637 A.2d 34, 48-49 (Del. 1994). Here, the Allied Board members breached their fiduciary duty to maximize shareholder value by refusing to consider a facially superior offer from Prospect, which has been cited in the press as potentially providing hundreds of millions of dollars in additional value to Allied shareholders. (Matyjewicz Decl. Exs. 1 and 4). In addition, Allied's Board of Directors have a fiduciary duty to negotiate with Prospect regarding its increased January 26, 2010 offer and to open the bidding process to maximize shareholder value.

### 2.    Defendants breached their duty to disclose material information

The directors of a Maryland corporation also have a duty "to disclose fully and fairly all material information within the Board's control when it seeks shareholder action." *Parish v.*

*Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 74, 242 A.2d 512, 539 (1968) (officers and directors of a corporation have a duty to disclose all facts material to the corporate transactions); *Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (citations omitted).  This duty requires that Defendants not misrepresent any of the information disclosed to shareholders. *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) (requiring disclosures to "provide a balanced, truthful account of all matters"); *see also In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts.")

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.  It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote.  What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been reviewed by the reasonable investor as having significantly altered the "total mix" of information made available. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (internal citations omitted); *see also Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992); *Stroud v. Grace*, 606 A.2d 75, 84-85 (Del. 1992).  The standard is whether the fact would have been relevant to investors' decisions, *not* whether it necessarily would have changed investors' decisions regarding the transaction. *See Shell Petroleum*, 606 A.2d at 114; *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1289 (Del. 1989). Moreover, "courts should not assess the qualitative importance of a

particular disclosure item because the standard requires 'full' disclosure of all material facts." *Id*. (internal citations omitted).

It is also a violation of Section 14(a) and SEC Rule 14a-9 to misrepresent or omit material facts from a Proxy Statement. 15 U.S.C.A § 78n(a); *Virginia Bankshares, Inc v. Sandberg*, 501 U.S. 1083 (1991) (explaining that § 14(a) and related rules prohibit solicitation of proxies by means of materially false or misleading statements); *TSC Industries v. Northway, Inc.*, 426 U.S. 438 (1976) (remedial purpose of § 14(a) of the Securities Exchange Act of 1934 is to prohibit the issuance of misleading proxy statements to enable shareholders to make informed choice).

Here, the Defendants made numerous material misrepresentations to Allied shareholders via the Proxy and actively concealed material information regarding Prospect's repeated efforts over a nine month period of time to enter into negotiations to acquire Ares for greater consideration contemplated by the Proposed Transaction.  Defendants have failed to disclose why Allied refused Prospect's numerous expressions of serious interest made over the last nine months and only provided a cursory explanation of Allied's rejection of the Prospect Offer, which had at least a 15% greater value than the offer presented by Ares.[6]

In addition, Defendants failed to disclose crucial methodologies, projections, key inputs and multiples relied upon by Sandler O'Neill in rendering its fairness opinion. This information constitutes material disclosures required for Allied shareholders to make an informed decision. As explained in *In re Netsmart Techs. S'holders Litig.*, 934 A.2d 171, 203 (Del. Ch. 2007):

> Once a board broached a topic in its disclosures, a duty attaches to provide information that is 'materially complete and unbiased by the omission of material facts.' For this reason, when a banker's endorsement of the fairness of a transaction is touted to

---

[6] Prospect also stated that it would consider offering additional consideration if additional disclosures from Allied warranted an increase.

shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. ***Only providing some of that information is insufficient to fulfill the duty of providing a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the board as to how to vote . . . rely.*** (Emphasis added)

According to Plaintiffs' financial expert, the fairness opinions of Allied's financial experts are based on an "undisclosed black box of information, the contents of which, the shareholders need to be able to review and consider in evaluating the financial merits of the Proposed [Transaction]. The proposed purchase of Allied's interests in the Callidus Funds, a significant asset of Allied, for an undisclosed amount dramatically reduced the ability to judge the adequacy and fairness of the merger consideration offered by Ares." (Matyjewicz Decl Ex. 1) As such, without this information it is impossible for the shareholders to make an informed decision regarding the Proposed Transaction.

### B.    Preclusive Deal Protections

An injunction is warranted where, as here, the combination of deal protection devices to protect a merger are not "reasonable and proportionate" to the threat that the target corporation perceived from the potential loss of the transaction. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 934 (Del. 2003). In *Revlon, Inc. v. McAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986), the Delaware Supreme Court affirmed a preliminary injunction of a merger because, among the many other deal protection devices, the merger agreement granted a lock-up option to purchase Revlon's Vision Care and National Health Laboratories divisions for $100 - $175 million below the value ascribed to the board by its banker, if another acquirer received 40% of Revlon's shares. *Revlon*, 506 A.2d at 178.   Lock-ups involving "crown jewel" assets require careful board scrutiny which attends the decision. When the intended effect is to end an active auction, at the very least the independent members of the board must attempt to negotiate

alternative bids before granting such a significant concession. *Revlon*, 506 A.2d at 183.  The lock-up in Revlon had a destructive effect on the auction process.  The potential acquirer had already been drawn into the contest on a preferred basis, so the result of a lock-up was not to foster bidding, but to destroy it.

In the case at bar, the Allied Board gave away two crown jewels of Allied.  At the announcement of the transaction, Allied sold its SL Fund to Ares for $165 million.  In addition, December 21, 2009, Allied sold its Callidus portfolio to GSO/Blackstone Debt Funds Management, LLC for an undisclosed price.  Neither of these crown jewel sales produced any concessions from Ares to increase its offer nor has it fostered bidding.

In addition, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Allied Board from soliciting proposals relating to alternative tender offers or business combinations which may increase shareholder value.  The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to alternative business combinations.  In addition to the "no shop" and "standstill" provisions, the Merger Agreement includes a $30 million termination fee should the Board choose to accept a superior deal.  As such, Plaintiffs' motion for a preliminary injunction should be granted.

## III.    THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF A PRELIMINARY INJUNCTION IS NOT ENTERED

Plaintiffs will suffer irreparable injury if Allied is not required to negotiate in good faith with Prospect. *See Michigan Citizens For An Indep. Press v. Thornburgh*, C.A. No. 88-2322, 1988 WL 90388, at *6 (D.D.C. Aug. 17, 1988) (finding irreparable injury from merger because consolidation would make it "very difficult to reassemble this egg once it has been scrambled"); *see also ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003) (threat of an

uniformed shareholder vote constitutes irreparable harm*); In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002) (irreparable injury is threatened when a shareholder might make a voting decision on the basis of materially misleading or inadequate information). *See also HCA Inc.*, 2006 WL 348273, at *2 (noting that the "optimal time to bring a disclosure claim in connection with a proposed merger is before the vote is taken and the deal closes").

Here, once the Proposed Transaction closes, the Plaintiffs and the other Allied shareholders would be irreparably harmed because they will have lost the opportunity to obtain the best possible combination for the Company going forward. *See In re Netsmart Tech., Inc. S'holders Litig.*, 924 A.2d 171, 207 (Del. Ch. 2007) (shareholders face threat of irreparable injury when a board seems to have breached its *Revlon* duties or failed to disclose material facts in advance of a merger vote.)   Because the Proposed Transaction is a stock-for-stock exchange, the transaction is essentially irreversible and it would be wholly impracticable to adequately compensate a shareholder after the Merger is consummated.   *See Gilmartin v. Adobe Ress. Corp.*, 1992 WL 71510, at *13 (Del Ch Apr.6, 1992*) (*finding irreparable harm where merger could not be reversed because it involved the issuance of new securities that would be publicly traded on the national securities market).  Plaintiffs would also be irreparably harmed if the Proposed Transaction closes without additional disclosures because the Proxy fails to provide enough information for Allied shareholders to make a reasonably informed decision.   Indeed, courts ***routinely grant injunctive relief to prevent shareholders from making an uninformed vote.***   *See, e.g., ODS Technologies, L.P. v. Marshall,* 832 A.2d 1254, 1262-3 (Del. Ch. 2004) (granting preliminary injunction on disclosure claim because threat of uninformed stockholders vote constituted irreparable harm to stockholders*).

## IV.    A PRELIMINARY INJUNCTION WOULD NOT SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES

The harm that Allied shareholders would suffer if they are forced to vote on the Proposed Transaction in reliance upon inadequate and misleading disclosures far outweighs the harm that Defendants might face in being prevented from consummating the Proposed Transaction until corrective disclosures are provided. Indeed, absent a preliminary injunction, Allied shareholders will suffer irreparable harm.

As discussed above, Defendants breached their fiduciary duties to Allied shareholders by providing materially deficient disclosures and actively concealing crucial information. These material misrepresentations and omissions deprive Allied shareholders of their ability to determine how to vote with respect to the Proposed Transaction, and shareholders' "inability to make that choice constitutes irreparable harm. . . ."  *Sealy Mattress Co.*, 532 A.2d at 1340. Accordingly, the only way to redress Defendants' breaches is through injunctive relief—Defendants' breaches cannot be cured in any other way.  *See In re Staples, Inc. S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001) (explaining that injunctive relief is appropriate to address material disclosure problems and that "[a]n injunctive remedy of that nature specifically vindicates the stockholder right at issue—the right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable."); *see also In re Anderson, Clayton Shareholders Litig.*, 519 A.2d 669, 676 (Del. Ch. 1986) (finding injunction appropriate where damages would be difficult or impossible to assess).

If the Proposed Transaction is permitted to proceed despite the disclosure violations, it would be all but impossible to correct these breaches of duty at a later time.  *See Gimbel v. Signal Cos.*, 316 A.2d 599, 603 (Del. Ch.), *aff'd*, 316 A.2d 619 (Del. 1974) ("While the remedy

of rescission is available, it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed.").

For the foregoing reasons, Plaintiffs and the Class will suffer irreparable harm if this Court does not intervene and prevent Defendants from proceeding with the Proposed Transaction absent a fully informed shareholder base.

By contrast, Defendants will suffer no hardship if the Court requires the Defendants to provide supplemental and curative disclosures to Allied Shareholders and be required to negotiate in good faith with Prospect. *See Wisconsin Inv. Bd. v. Bartlett*, No. 17727, 2000 WL 193115 (Del. Ch. Feb. 9, 2000) (noting that hardships suffered by Defendant by delay of vote were *de minimus* when compared to the possibility that the shareholders voted on the extinction of their corporation with less than all the material reasonably available to them); *In re Anderson, Clayton Shareholders Litig.*, 519 A.2d 669, 676 (Del. Ch. 1986) (recognizing, in balancing harm, that "delay in any large transaction may involve risks of employee agitation or market fluctuations," but finding those factors not "especially significant" in view of the "fundamental importance" of the transaction "and its likely long-term consequences"). Defendants, in fact, have already made supplemental disclosures and would suffer no harm by doing so again. Any postponement of the closing of the Proposed Transaction, to the extent that it is even necessary, to allow for corrective disclosures is, on balance, worth the cost because it will ensure an informed vote. *See Staples, supra.*

The shareholders' right to make an informed decision must be protected.  "[R]espect for the shareholders' right to determine the course of this Company's future" compels granting Plaintiff's motion for a preliminary injunction. *In re Anderson, Clayton*, 519 A.2d at 679.

## V.   A PRELIMINARY INJUNCTION WOULD FURTHER THE PUBLIC INTEREST

Public policy considerations also weigh in favor of issuing a preliminary injunction. Maryland and federal public policy strongly supports providing shareholders with all material information in connection with voting on mergers and acquisitions.  Indeed, full disclosure is the hallmark of Delaware corporate law as well as this nation's securities laws.  Absent full disclosure, investors are left to make decisions in the dark.  Accordingly, where Defendants have breached their fiduciary duties by failing to maximize shareholder value, made misleading disclosures and have omitted material information, public policy supports Plaintiff's motion for a preliminary injunction.

## VI.   EXPEDITED DISCOVERY IS APPROPRIATE

In order to present the Court with a more complete factual record upon which to consider the merits of the Plaintiffs' request for a preliminary injunction, expedited discovery is needed to adduce material information concerning Defendants' consideration of and decision to enter into the Proposed Transaction.  Rule 26(d) of the Federal Rules of Civil Procedure generally provides that formal discovery will not commence until after the parties have conferred as required by Rule 26(f). *Quest Commc'ns Int'l Inc. v. Worldquest Networks, Inc.,* 213 F.R.D. 418, 419 (D.Colo. 2003); *Avyash v. Bank Al-Madina,* 233 F.R.D. 325, 326 (S.D. N.Y. 2005). "However courts may expedite discovery before the Rule 26(f) conference upon a showing of good cause." *Quest Commc'ns Int'l, Inc.,* 213 F.R.D. at 419.  Good cause exists where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the

responding party. *Semitoole Inc. v. Tokyo Electron Am.,Inc.,* 208 F.R.D. 273, 275 (N.D. Cal. 2002).

The good cause standard may be satisfied where a party seeks a preliminary injunction. *Quest Commc'ns Int'l, Inc.,* 213 F.R.D. at 419; *see also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F.Supp.2d 986, 991 (S.D. Tex. 2004) ("Expedited discovery [is] appropriate in cases involving preliminary injunctions or challenges to personal jurisdiction"); Advisory Committee Notes to 1993 amendments to Rule 26(d) (discovery before 26(f) conference "will be appropriate in some cases, such as those involving requests for a preliminary injunction or motions challenging personal jurisdiction").

When expedited discovery is related to a motion for a preliminary injunction, courts consider the reasonableness of the request in light of the entire record to date and all of the surrounding circumstances. *Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority*, 234 F.R.D. 4 (D.D.C. 2006). Factors courts consider in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose of requesting expedited discovery; (4) the burden on defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made. *Van Valin v. Locke,* 628 F.Supp. 67 (D.D.C. 2009). "The foregoing factors should be balanced on a 'sliding scale,' i.e., a lesser showing on one factor can be surmounted by a greater showing on another factor." *Id.* at 72., *citing CSX Transp. Inc., v. Williams,* 406 F.3d 667 (D.C.C. 2005).

In Delaware, where many of these types of cases are heard, expedited proceedings are the norm. *See In Re Int'l Jensen S'holders Litig*., No. 14992, 1996 WL 422345, (Del.Ch., July 13, 1996) ("A party's request to schedule an application for a preliminary injunction and to expedite

the discovery related thereto is normally routinely granted.  Exceptions to that norm are rare.");

*Harmony Mill Ltd. Partnership v. Magness*, No. 7463, 1984 WL 21898  (Del. Ch., Feb. 14,

1984) (granting expedited discovery over defendants' objections); *Grimes v. Vitalink

Communications Corp.*, 17 F.3d 1553, 1555 (3d Cir. 1994) (granting expedited discovery in suit

concerning allegations that Defendants breached their fiduciary duties in approving a merger); *F.

T. C. v. University Health, Inc*., 938 F.2d 1206, 1210 (11th Cir. 1991) (granting expedited

discovery where FTC sought to enjoin asset acquisition); *Ronson Corp. v. Liduifin

Aktiengesellschaft*, 483 F.2d 846, 848 (3d Cir. 1973) (granting expedited discovery in

shareholder litigation seeking to enjoin tender offer).  In such circumstances, the slower pace of

normal pretrial discovery will always prejudice the party seeking injunctive relief, because, by

the time responses are due, the transaction may be completed.  In this case, that will certainly be

true because the Proposed Transaction is scheduled to take place in the first quarter of 2010.

Moreover, where as here, there are material deficiencies in the documents presented to

shareholders, such as the Proxy, courts have routinely granted motions for expedited proceedings

finding that the threat of an uninformed shareholder decision constitutes irreparable harm.  *See,

e.g., Allen v. News Corp.*, No. 979, 2005 WL 415095 (Del. Ch. Feb. 3, 2005) (granting motion to

expedite and setting preliminary injunction hearing relating to disclosure claims); *ODS

Technologies v. Marshall,* 832 A.2d 1254, 1262 (Del. Ch. 2003) (threat of an uniformed

shareholder vote constitutes irreparable harm); *In re Pure Resources,* 808 A.2d 421, 452 (Del.

Ch. 2002) (irreparable injury is threatened when a shareholder might make a voting decision on

the basis of materially misleading or inadequate information); *see also In re HCA Inc.*, No. 2307-

N, 2006 WL 3480273, at *2 (Del. Ch. Nov. 20, 2006) (noting that the "optimal time to bring a

disclosure claim in connection with a proposed merger is *before* the vote is taken and the deal

closes").

Because the Proposed Transaction in this case will be completed within the next two months, the Plaintiffs must move quickly to further develop and present the evidentiary basis for the preliminary injunction sought. The Plaintiffs will supplement their allegations with evidence supporting their claims that Defendants have breached their fiduciary duties by, among other things, failing to adequately disclose material information necessary for shareholders to make an informed decision as to whether to vote in favor of the Proposed Transaction. However, if the Proposed Transaction proceeds as scheduled and the Plaintiffs are precluded from supplementing the evidentiary record, the Plaintiffs will be hindered in their ability to make a record upon which the Court can assess the merits of the Plaintiffs' motion.  Accordingly, expedited discovery is warranted.

The benefit of allowing the Company's public shareholders a meaningful opportunity to protect their rights as shareholders of the Company far outweighs the minimal burden placed on Defendants in producing documents and making themselves available for depositions on an expedited basis. The Plaintiffs seek limited discovery that will allow them to pursue injunctive relief on a more complete record.

Moreover, the Plaintiffs have sought to limit any burden or hardship on Defendants by requesting discovery that is narrowly tailored to obtain the information necessary to evaluate the Proposed Transaction and to show that the disclosures made in the Proxy are materially deficient. Notably, Defendants and their advisors are solely in possession of analyses concerning the Proposed Transaction and all such other documents relevant thereto. Thus, these documents are readily available to Defendants to produce to the Plaintiffs. As such, the burden on Defendants in producing such documents and witnesses for deposition on an expedited basis will

be minimal.

The Plaintiffs' discovery requests are limited in scope and are not disruptive or burdensome. Accordingly, the Plaintiffs respectfully request that the Court grant these discovery requests on an expedited basis.

## DISCOVERY REQUESTED

The Plaintiffs request that this Court order Defendants to produce the following:

1.     all minutes and notes of the Board of Directors of the Company and/or any special committee or subcommittees in connection with the Proposed Transaction;

2.     all communications (including e-mails) between the Company and/or any individual Defendant and any third party who expressed any interest in a potential alternative transaction with the Company since January 1, 2009. (The Plaintiffs are willing to limit this request to a reasonable number of custodians and search terms);

3.     all communications (including e-mails) between the Company and Ares regarding the Proposed Transaction;

4.     all documents and/or information presented to the Board regarding the Proposed Transaction, including the analysis performed by BofA Merrill Lynch, as well as documents regarding BofA Merrill Lynch's scope of employment;

5.     all documents and/or information presented to the Board regarding the analysis performed by Sandler O'Neill as well as documents regarding Sandler O'Neill's scope of employment;

6.     all documents and/or information presented to Ares regarding the Proposed Transaction, including the analysis performed by JP Morgan, as well as documents regarding JP Morgan's scope of employment, and JP Morgan's invoice for services rendered in connection with the Proposed Transaction;

7.     all documents, including communications, concerning any efforts by or on behalf of the Company to solicit any third party to enter into a transaction with the Company since January 1, 2009;

8.     all financial projections prepared by management for the Company since January 1, 2008 and all financial projections given to BofA MerrillLynch in connection with rendering its fairness opinion in connection with the Proposed Transaction;

9.     all agreements relating to the Proposed Transaction between any member of the

Board of Directors and Allied;

10. all document and/or information regarding third party inquiries relating to acquiring Allied in the past 12 months, including but not limited to inquiries by Prospect;

11. all documents and/or information pertaining to offers to acquire Allied by Prospect

12. all documents and/or information regarding the Board's rejection of Prospect's offer to acquire Allied in January 2010;

13. all documents and/or information pertaining to the agreement between Allied and GSO Capital Partners for GSO Capital Partners to purchase the Collateral Management Agreements of Callidus Capital Management; and

14. all documents and/or information regarding Ares' acquisition of Allied interest in its SL Fund for $165 million in cash.

In addition to document discovery, the Plaintiffs seek deposition testimony of witnesses knowledgeable about the circumstance of the Proposed Transaction and Prospect's inquiries and offer to acquire Allied in January 2010. Accordingly, Defendants should produce, at a minimum, the members of Allied and Ares management most knowledgeable about the negotiation of the proposed transaction, the members of Allied and Aries management most knowledgeable about the preparation of the Company's internal financial projections and forecasts, and an independent member of the Board knowledgeable about the sale process relating to the Proposed Transaction.

In order to allow the Plaintiffs to develop the record sufficiently in advance of the close of the Proposed Transaction, Plaintiffs ask that Defendants be ordered to provide the requested discovery material no less that seven days after this Court rules on Plaintiffs' Request for Expedited Discovery and that Defendants be ordered to produce witnesses for deposition no later than fourteen days after this Court's ruling.

## <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiffs respectfully request that the Court enter the accompanying order to allow expedited discovery and scheduling an expedited hearing for Plaintiffs' motion for a preliminary injunction, as well as any other remedy the Court deems appropriate.

Dated: January 26, 2009

FINKELSTEIN THOMPSON LLP


/s *Donald J. Enright*_____
Donald J. Enright, Esq. (MD013551)
Michael G. McLellan, Esq. (489217)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Tel:  (202) 337-8000
Fax:  (202) 337-8090

**OF COUNSEL**
LEVI & KORSINSKY, LLP
Eduard Korsinsky, Esq.
Juan E. Monteverde, Esq.
Ian T. Matyjewicz
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth Tripodi, hereby certify that on this 26th day of January 2010, copies of

the foregoing Motion for Preliminary Injunction and Expedited Proceedings and papers

in support thereof were sent via email to the following:

> Thomas F. Connell, Esquire
> Mathew Jones, Esquire
> WilmerHale LLP
> 1875 Pennsylvania Avenue, NW
> Washington, DC  20006
> ***Attorneys for Defendant Allied Capital Corporation***
> ***and the Individual Defendants***
>
> Sarah S. Gold
> Margaret Dale, Esquire
> Proskauer Rose LLP
> 1585 Broadway
> New York, NY  10036-8299
> ***Attorneys for Defendant Ares Capital Corporation***

> /s *Elizabeth K. Tripodi*
> Elizabeth K. Tripodi